LEODIS C. MATTHEWS (SBN 109064)
E-mail: LeodisMatthews@ZhongLun.com
ANGELICA CHOPURYAN (SBN 311205)
E-mail: AChopuryan@ZhongLun.com
**ZHONG LUN LAW FIRM LLP**
4322 Wilshire Blvd., Suite 200
Los Angeles, California 90010
Telephone: (323) 930-5690
Facsimile: (323) 930-5693

Attorneys for Plaintiff TIGRAN 'THEO' NERSESYAN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| TIGRAN 'THEO' NERSESYAN, an individual,<br><br>        Plaintiff,<br><br>   v.<br><br>USCB, INC., a California corporation dba USCB America; ALBERT CADENA, an individual; and DOES 1 through 100, inclusive,<br><br>        Defendants. | Case No.: 2:25-cv-08687<br><br>COMPLAINT FOR DAMAGES:<br>1. Retaliation in Violation of ERISA<br>2. Breach of Fiduciary Duty in Violation of ERISA<br>3. California Labor Code § 1102.5 – Whistleblower Retaliation<br>4. Wrongful Termination in Violation of Public Policy<br>5. Intentional Infliction of Emotional Distress<br><br>**JURY TRIAL DEMANDED** |

Plaintiff TIGRAN THEO NERSESYAN ("THEO"), through his attorneys, files this Complaint for damages against Defendants USCB, INC. dba USCB America, and any of its respective subsidiaries or affiliated companies within the State of California ("USCB"); ALBERT CADENA ("CADENA"); and DOES 1 through 100, as further defined below, and alleges as follows:

## I. PARTIES

1.    Plaintiff, TIGRAN THEO NERSESYAN ("THEO"), is an individual and a resident of Los Angeles, California.  At all relevant times, Plaintiff was employed by Defendant USCB and a participant in an employee benefits plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.

2.    Defendant USCB, INC. dba USCB America and any of its respective subsidiaries or affiliated companies within the State of California ("USCB" or "the Company") is, and at all times relevant hereto was, a corporation organized and existing under and by virtue of the laws of the State of California and doing business in the County of Los Angeles, State of California with its principal place of business located at 355 S. Grand Ave., 32nd Floor, Los Angeles, CA 90071. Defendant USCB is an employer as defined under ERISA, 29 U.S.C. § 1002(5), and administers ERISA-covered employee benefits plans.

3.    Defendant ALBERT CADENA ("CADENA") is an individual and a resident of Los Angeles, California. Defendant Cadena is, and at all times relevant to this action, has been and continues to be the Chief Executive Officer ("CEO") and President of USCB, acting as a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A).

4.    The true names and capacities, whether individual, corporate, associate, or otherwise, of those defendants sued herein as DOES 1 through 100, inclusive, are currently unknown to Plaintiff, who therefore sues defendants by such fictitious names. Plaintiff is informed and believes and, based thereon, alleges that each of the defendants designated herein as DOE is legally obligated and responsible in some manner for the unlawful acts referred to herein. Plaintiff will seek leave of the Court to amend this Complaint to reflect the true names, roles, and capacities of the defendants designated hereinafter as DOES when such

identities become known.

## II.    JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1) and (f), which provides for exclusive federal jurisdiction over actions brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq."

6.    This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims under ERISA that they form part of the same case or controversy under Article III of the United States Constitution.

7.    Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because Defendants are located within the Central District of California, and the acts and omissions giving rise to the claims occurred within this district.

## III.    FACTUAL BACKGROUND

A. About USCB

8.    USCB is a nationally recognized provider of revenue cycle management and bad debt collection services dedicated to serving notable hospitals and healthcare providers. The services offered encompass a comprehensive range of services, including insurance billing, denial management, collections, and staffing solutions.

9.    In 2004, USCB underwent a major structural transformation by selling 100% of its stock to an Employee Stock Ownership Plan (ESOP).

10.    In 2012, USCB acquired a small agency called North Coast Collection Services, Inc., giving USCB a base in Santa Rosa, California.

11.    In 2018, USCB acquired J&L Teamworks and RevSolve, Inc., a medical collections and revenue cycle management firm based in Scottsdale, Arizona.

12.    As part of its growth strategy, USCB expanded its footprint across multiple states, establishing key operational hubs, including a data center in Mesa, Arizona, at 1355 W. University Dr.("MESA DATA CENTER").

13.    Since March 2014, Cadena has served as President and CEO at USCB.

B. Theo's Employment History

14.    Theo joined USCB in 1998 and dedicated over 25 years to the organization, contributing in various capacities, including operations, compliance, project management, and technology. Since 2019, he has held the position of Senior Vice President and Chief Information Officer of Strategic Initiatives.

15.    In December 2015, Plaintiff was granted 2,500 shares of a specialized type of ESOP shares known as "Stock Appreciation Rights" (SARS) as part of an Above and Beyond recognition award. These shares were forfeited due to Plaintiff's termination. At the time of separation, the projected value of these shares was $61,275.00 for the year 2023.

16.    In January 2017, the diligent efforts of the Plaintiff in conducting a detailed vendor cost analysis and successfully recovering USCB financial service credits culminated in receiving the first-ever Employee of the Year award. This prestigious recognition was accompanied by an "Above and Beyond" bonus of $2,500.00, a crystal award, and company-wide acknowledgment of the achievement. During the review of vendor invoices, it was revealed that USCB was incurring costs for various perks related to Cadena, including a Maserati lease of $1,600.00 and other personal expenses.

17.    On June 24, 2019, Plaintiff was promoted to Senior Vice President and Chief Information & Technology Officer for Strategic Initiatives and oversaw all technology departments, including Information Technology, Information Systems, Information Security, Business Intelligence (Reporting), and Special Projects. At the age of 39, he became the youngest Senior Vice President in the

Company's history.

18.    In August 2019, USCB notified the Plaintiff that the Company would be obtaining a "Key Man" life insurance policy on the Plaintiff. Key man life insurance is provided for key employees who possess unique talents, experience, or skills that are vital to the success of the business. It safeguards the business against the financial consequences of losing an essential employee.

19.    Additionally, Plaintiff qualified for a specialized benefit known as BeniComp, a privilege exclusively available to Senior Executives. BeniComp is a fully insured supplemental group executive medical expense reimbursement insurance policy. During the Live Scan fingerprinting process for state licensing, Cadena repeatedly stated that the Plaintiff would be positioned to assume the presidential role at USCB in the future.

20.    In March 2020, the Company instituted a shelter-in-place order in response to the COVID-19 pandemic, necessitating the Information Technology department to transition hundreds of employees to virtual desktops within a limited timeframe. Consequently, USCB was able to maintain uninterrupted operations. During an executive meeting, Cadena recognized Plaintiff's significant contributions, stating that Plaintiff had played a crucial role in ensuring the continuity of the Company's business.

21.    In September 2020, Plaintiff was awarded an Above and Beyond Cash bonus in recognition of exemplary foresight and technological planning that contributed to significant cost savings for USCB.

22.    On September 26, 2023, USCB issued 3,000 Phantom Shares ("Phantom") to Plaintiff as part of the Above and Beyond award. The projected value of these shares at the time of separation is estimated to be $73,530.00, calculated based on a stock price of $24.51 per share.

23.    During the course of Theo's employment, Plaintiff was a participant

in USCB's employee benefits plans, including but not limited to ESOP shares, life and health insurance, 401(k), Phantom, and SARS.

C. Ghost Employee's "Employment" at USCB

24.    On April 4, 2013, Theo and the former Human Resources Director received a notification from Cadena about the onboarding of a new employee who would report to the Mesa Data Center, managed by Theo. As the Assistant Vice President of Information Technology, Theo was informed that he would not have any specific responsibilities for the new employee, as those duties would be handled by the Human Resources Director, which was a departure from the usual protocol.

25.    Given this arrangement, the Plaintiff raised several unanswered questions. However, the Human Resources Director scolded him for questioning the CEO's directive and advised that it would be best for the Plaintiff to avoid discussing these issues further or mentioning them to others.

26.    On April 8, 2013, the new employee started at USCB, essentially as a "ghost employee" (herein referred to as the "Ghost Employee"), and was assigned to work under the Plaintiff, but unlike other employees, he didn't work with or report to the Plaintiff.

27.    In July 2017, the Ghost Employee told the Plaintiff that the assigned employee password needed resetting due to inactivity, which was unusual for employees to request. From 2015 to 2017, USCB used a security tool called Netwrix Auditor, which disabled accounts after 21 days of inactivity to identify employees who had not been properly offboarded. This mechanism was put in place to improve Information Security control and maturity for annual audits. If that "Ghost Employee" had been functioning as a regular employee, the password would not have been deactivated. Additionally, the Ghost Employee would have had "ADMIN" credentials to log into Active Directory and reset the password

without soliciting Plaintiff to do so.

28.    In November 2020, the Ghost Employee instructed the Plaintiff to set up an auto-forward on USCB's email server to relay all company emails, specifically messages from the former Human Resources Director and the Lead Human Resources Generalist, to his personal email.

29.    In September 2022, an inquiry was received regarding a potential security breach within the Company's payroll system, ADP. This issue allowed a regular employee to access not only their own payroll information but also payroll information of all employees within the entire USCB organization. An inadvertent modification made by the Human Resources department to the ADP profiles also unintentionally exposed sensitive information, including a significant pay increase for USCB's CEO, Albert Cadena, and several bonuses approved for the Ghost Employee during a time when other employees were proposed a reduction in pay.

30.    On January 6, 2023, the Vice President of Human Resources submitted an Employee Termination workflow ticket for the Ghost Employee. An IT Systems Administrator processed this termination on the same day.

31.    In the resolution remarks, the IT Systems Administrator noted that the Ghost Employee did not have a VDI (Virtual Desktop Infrastructure) account or an Office 365 account, two mandatory technology resources required for all USCB employees to perform their professional duties. Without these account connections, an employee could neither access a work computer, communicate via email, nor use any internal systems. Without these accounts, an employee could not effectively perform their job functions during the workday or time recorded on the payroll.

32.    Despite lacking these accounts, the Ghost Employee had been listed as a functioning employee for over a decade, received an annual salary that exceeded $60,000, and was enrolled in company benefit plans, including ESOP

shares and health care coverage.  Functionally, in the status as a "ghost employee", this person received compensation without providing services, which constituted a misuse of corporate and plan assets, a breach of fiduciary duty by those who permitted the Ghost Employee's continued employment, which constituted a knowing and deliberate violation of USCB's internal policy.

33.    USCB, under the leadership of its CEO, Albert Cadena, failed to adequately supervise its operations. They not only participated in concealing a scheme but also neglected to disclose or rectify it. As a result, plan assets and shareholder funds were improperly diverted to an individual who had neither been assigned responsibilities nor had access to the basic tools required to perform effectively as an employee.  This concealed arrangement raises serious questions of corporate fraud, internal control failures, and fiduciary breach under 29 U.S.C. § 1104.

D. Events Leading Up to the Whistleblowing

34.    In the months leading up to the Plaintiff's termination, the previous Human Resources Director at USCB played a key role in disclosing and contributing to the Company's increasing crisis in ethical and regulatory compliance. Those actions of disclosed misconduct highlight the toxic and retaliatory culture to which the Plaintiff ultimately fell victim.

35.    In August 2022, a USCB employee, the Vice President of Self Pay, formally requested a meeting with Cadena and the Human Resources department to report the existence of an ongoing hostile work environment. The complaint specifically implicated a USCB's Senior Vice President and Chief Revenue Officer, who had allegedly actively fostered a pattern of aggressive, demeaning, and retaliatory behavior toward subordinate staff.

36.    During a meeting with Cadena, it was disclosed that others had experienced similar instances of demeaning treatment from the same executive.

The meeting confirmed repeated instances that resulted in the creation of a toxic environment, which was created by senior leadership that traumatized the subordinate employees, leaving them feeling devalued and professionally stifled due to deliberate misconduct perpetuated and condoned by senior leadership.

37.    Rather than acknowledging the severity of the allegations or taking action to investigate or resolve the issue, Cadena offered no corrective path forward. No internal investigation was launched. No disciplinary action was taken against the admitted perpetrator; instead, the employee who reported the violations was subsequently sidelined and isolated.

38.    On September 16, 2022, the employee resigned from an executive-level position, under circumstances widely understood by colleagues, including Plaintiff, to be a constructive discharge.  The departure sent a strong message to others within the organization that raising concerns about executive misbehavior could lead to professional retaliation and forced removal.

39.    Following the departure, another employee, considered a company loyalist with no prior human resources experience, was elevated to Vice President of Human Resources. This appointment was viewed internally as a move to shield the executive team from accountability and ensure loyalty during the escalating compliance and whistleblower concerns surrounding payroll, executive benefits, and the potential DOL audit of the ESOP.

40.    USCB's failure to protect a senior-level executive from retaliation and its decision to replace her with a less qualified but more "loyal" executive reinforced the culture of suppression that eventually ensnared Plaintiff.  Plaintiff's later engagement with federal investigators and internal Department of Labor auditors mirrored the same whistleblower pathway the other executive-level employee attempted to navigate, with similarly retaliatory consequences.

E.    The Plaintiff's Essential Contributions to Digital Firsts

41.    In December 2021, USCB commenced research and engaged in discussions with vendors to formulate effective strategies for complying with the new requirements established by a California State Assembly Bill (AB) 1020. This legislation significantly impacted USCB's operations by mandating that collection agencies provide a copy of the final communication sent by the medical hospitals before the assignment of accounts to USCB for collection, resulting in a significant increase in additional labor and postage costs. Before AB 1020, the average outbound collection envelope contained approximately 1.5 pages. Following the implementation of the law, the page count ballooned to 8 to 10 pages per mailing, substantially increasing the Company's labor, printing, postage, and processing costs. This created an urgent need for a digital, scalable solution to handle document intake, processing, and delivery.

42.    Recognizing the severity of this compliance risk and operational burden, Plaintiff spearheaded the Digital First initiative, a multi-phase enterprise project aimed at digitizing client documents, automating mail workflows, and integrating compliant document-handling systems across USCB's infrastructure.

43.    Plaintiff was responsible for several key tasks, including conducting vendor evaluations and leading contract negotiations to secure scalable digital infrastructure. This involved architecting the system integration between the document feeds of numerous hospital partners and USCB's internal systems.

44.    Additionally, Plaintiff oversaw the IT and security teams to ensure compliance with HIPAA regulations and maintained data integrity. Plaintiff also trained cross-functional teams on the use of the new systems and compliance workflows.

45.    Finally, the Plaintiff coordinated with legal and compliance teams to ensure complete adherence to AB 1020 and other industry standards.

46.    By early 2024, Plaintiff had successfully led the team through the

completion of Phase I, ensuring that every outbound consumer communication met the regulatory document requirements. The success of this implementation directly enabled USCB to efficiently maintain its major hospital accounts, avoid potential legal exposure, and prevent costly noncompliance penalties.

47.     On April 3, 2024, the day before his termination, Cadena personally contacted Plaintiff via text message requesting a callback.  During the conversation, Cadena congratulated Plaintiff for resolving all major issues associated with Digital First and expressed satisfaction with the project's progress into Phase II, which focused on digital delivery enhancements and cost optimization. There were no performance concerns raised, and Cadena acknowledged the critical nature of the Plaintiff's contributions to the effective operation of their organization's statutory-imposed requirements.

48.     Despite this, Plaintiff was abruptly terminated the following day, on April 4, 2024, under the pretext that his role was being eliminated, a decision that contradicted the operational importance of Digital First and Cadena's own statements made just hours earlier.

49.     Plaintiff's leadership in Digital First not only preserved USCB's compliance status but was instrumental in positioning the Company for future efficiency and growth. His termination, immediately following these achievements, evidences a retaliatory motive wholly inconsistent with any legitimate business rationale.

F.   Plaintiff's Cooperation in the DOL Investigation

50.     USCB received correspondence dated July 21, 2023, from the United States Department of Labor, addressed to Cadena, as CEO, and USCB's Chief Financial Officer, from a Department of Labor Investigator, announcing a review and audit of USCB America's Employee Stock Ownership Plan.

51.     Upon receipt of the letter, Cadena circulated an internal email to

USCB's executive team with the subject line "Routine Audit." In this communication, Cadena downplayed the significance of the federal inquiry, describing it as a "routine" audit review, which implied that no further scrutiny or preparation was necessary. Cadena further assured leadership that the last audit, conducted in 2009, yielded no adverse findings.

52.    However, Plaintiff recognized that the timing and scope of the 2023 review were far from routine. The audit followed years of questionable activity surrounding issues regarding USCB's ESOP compliance

53.    As a senior executive with operational expertise and access to internal systems, on December 7, 2023, Plaintiff participated in a confidential and substantive meeting with representatives from the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) as a result of the agency's ongoing audit of USCB's ESOP.

54.    Plaintiff's meeting with the DOL was undertaken in good faith and constituted a protected activity under ERISA § 510 (29 U.S.C. § 1140), which provisions prohibit retaliation against any participant who provides information relating to plan operations or breach of a fiduciary's obligations.

55.    Shortly after this meeting, Plaintiff began to experience increasingly pronounced forms of professional isolation orchestrated by USCB's senior managment. He was excluded from strategic meetings that he typically led or participated in. Cadena ceased to communicate with the Plaintiff regarding project updates, despite his leadership role in Digital First, a crucial regulatory compliance initiative. Key personnel started sharing internal discussions that suggested and emphasized that "loyalty to the company" had become a new criterion for advancement and job stability, indicating a potential cultural purge.

56.    Then, on April 4, 2024, less than four months after his protected meeting with the DOL, Plaintiff was abruptly terminated under the fabricated

pretense that his position was being "eliminated."

57.   After Plaintiff's termination, he was forced to forfeit earned equity compensation, including Phantom and SARS, benefits awarded in recognition of his high-level contributions.

58.   Additionally, Plaintiff's Key Man Life Insurance Policy, funded by USCB, was allowed to lapse without notice, stripping him of promised coverage and undermining the Company's prior assurances of his executive value.

G. USCB Has A Common Practice of Formally "Eliminating" Positions, Only To Subsequently Fill It Shortly Thereafter.

59.   USCB has a long-standing and well-documented practice of using the false pretense of "position elimination" as an excuse to quickly terminate employees, particularly those who are perceived as disloyal, outspoken, or whose sense of integrity is considered to be misaligned with the leadership's inner circle. This tactic enables the Company to bypass standard human resources procedures for progressive discipline, performance documentation, or formal layoff criteria, allowing for the removal of targeted individuals without accountability.

60.   Another employee, known to have raised issues of improper actions by another high-ranked employee, and a dedicated employee with over 30 years of service, was terminated as part of what USCB referred to as a restructuring initiative. That employee had previously served as the Executive Assistant to Melvin F. Shaw, the founder of USBC. Although USCB claimed that the position of Supervisor of the Administration team was being eliminated, it was filled shortly afterward, without any material changes to the role or responsibilities.

61.   Similarly, the Company's Information Security Officer was summarily dismissed in 2022 under the explanation that his position was no longer necessary.  No performance issues were cited, and no layoff process was followed. Shortly afterward, his core responsibilities were transferred to another loyalist

employee, who inherited critical compliance oversight duties, including IT security audit, and the Information Security department was restructured to report directly to Cadena.

62.     The Vice President of Self Pay was removed from the USCB organizational chart on April 4, 2024, the same day the Plaintiff was terminated. That executive-level employee had previously expressed concerns about executive misconduct, particularly regarding the toxic work environment, and reportedly had been in discussion with the Plaintiff regarding the DOL investigation of senior management's misconduct.

63.     This pattern enabled USCB to strip terminated employees of equity awards, severance, and benefits, while avoiding scrutiny under federal and state employment laws. It also served to instill fear in current employees, who understood that questioning leadership or cooperating with federal investigators could result in abrupt, unexplained dismissal.

## IV.    BASIS FOR LEGAL CLAIMS OF ACTION

### FIRST CAUSE OF ACTION

**(Retaliation in Violation of ERISA (29 U.S.C. § 1140)**

(Plaintiff against All Defendants)

64.     As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint and incorporates them by reference into this cause of action as though fully set forth herein, except those allegations which are inconsistent with this cause of action.

65.     Defendant's actions, as described herein, violate ERISA's anti-retaliation provisions, 29 U.S.C. § 1140, which prohibit employers from discharging, disciplining, or discriminating against any participant or beneficiary for exercising rights under an ERISA plan.

66.     At all relevant times, Plaintiff was an active participant in multiple

ERISA-covered employee benefit plans administered by USCB, including Employee Stock Ownership Plan (ESOP), Stock Appreciation Rights (SARS), Phantom Equity Shares, health, life, and supplemental executive insurance (including BeniComp and Key Man policies). These benefits were integral to Plaintiff's executive compensation and long-term financial security.

67.    Plaintiff engaged in a protected activity by cooperating in a Department of Labor audit that focused on the Company's Employee Stock Ownership Plan (ESOP). During this process, additional internal compliance issues were identified, particularly concerning the Ghost Employee, who was identified as the spouse of Cadena.  These issues highlighted problems related to improper benefit allocations and the misuse of payroll and benefit plan assets.

68.    Thereafter, Defendant Cadena subjected Plaintiff to adverse employment actions, including but not limited to abruptly terminating Plaintiff from his role as Senior Vice President and Chief Information Officer for Strategic Initiatives on April 4, 2024, less than two months after federal law enforcement agents visited his home and during part of an ongoing active DOL investigation. The stated reason for termination ("elimination of position") was demonstrably false, as the role was restructured and its responsibilities reassigned. Defendant Cadena's conduct was retaliatory and intended to interfere with Plaintiff's employment rights under State Laws and under ERISA.

69.    The Company falsely stated that the Plaintiff's position was being "eliminated," although the plaintiff had received praise just a day before for his work in leading the Digital First compliance initiative. There were no documented performance issues; his responsibilities were immediately redistributed within the Company, and no broader departmental restructuring occurred.

70.    There is a clear causal connection between the Plaintiff's protected ERISA activity and his termination. This connection is underscored by the

proximity of events: the Plaintiff had a confidential meeting with Department of Labor (DOL) investigators on December 7, 2023, and later cooperated with Federal Law Enforcement Agency investigating the misconduct uncovered. Plaintiff was terminated shortly after disclosing visits from federal investigators and, fewer than four months later, his disclosures to the Department of Labor, but not before he completed implementing Phase 1 of Digital Firsts.

71.    Moreover, during the meeting in which Plaintiff was terminated, Cadena demanded to know why the Plaintiff had not promptly and immediately notified him that Federal Law Enforcement Agents visited his home on February 15, 2024, further revealing that USCB's leadership was monitoring his external cooperation.

72.    Furthermore, USCB's pattern of retaliation is evident as other employees were terminated under the pretense of "eliminated positions" shortly after voicing internal compliance concerns.

73.    These instances of retaliation violated 29 U.S.C. § 1140, which is intended to protect employees from adverse action for exercising ERISA-related rights.

74.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff has suffered economic and non-economic damages, including but not limited to loss of wages, benefits, emotional distress, and other consequential damages.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty in Violation of ERISA
### (29 U.S.C. §§ 1104 and 1109)

(Plaintiff against All Defendants)

75.    As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint and incorporates them

by reference into this cause of action as though fully set forth herein, except those allegations which are inconsistent with this cause of action.

76.    Plaintiff brings this cause of action not only in his individual capacity as a participant in the USCB, Inc. Employee Stock Ownership Plan ("ESOP"), but also in a representative capacity on behalf of the ESOP pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

77.    Albert Cadena, USCB's CEO, as a plan administrator and fiduciary of the the USCB, Inc. Employee Stock Ownership Plan (the "Plan"), owed a fiduciary duty to Plaintiff and all other participants to act solely in their interest and for the exclusive purpose of providing benefits and defraying reasonable administrative expenses, as required by ERISA § 404(a)(1) and 29 U.S.C. § 1104(a)(1).

78.    Defendant Cadena, as a plan fiduciary, violated ERISA §§ 404, 406, and 409 (29 U.S.C. §§ 1104 and 1109), and breached these fiduciary duties in several material respects, including but not limited to the following:

    a.  Cadena was aware of and facilitated the long-term employment of his spouse, who was on payroll for over a decade without performing actual work. Cadena's spouse lacked any standard IT credentials and was paid an annual salary exceeding $60,000, with full access to ESOP and health benefits. This ghost employment arrangement not only diverted plan assets from legitimate beneficiaries but also undermined the integrity and financial standing of the ESOP. It was Plaintiff's disclosures confirming this arrangement that resulted in his summary termination.

    b.  When USCB received a formal notice from the U.S. Department of Labor on July 21, 2023, Cadena instructed executive staff to treat it as a "routine audit," despite the audit's direct relevance to possible

fiduciary misconduct involving the ESOP. By downplaying the investigation and failing to disclose material facts about potential violations, Cadena obstructed oversight and failed to act in good faith on behalf of plan participants.

c. While Plaintiff and other USCB employees experienced multiple rounds of involuntary salary reductions, including in 2017 and again in March 2022, Cadena awarded himself significant raises and bonuses. These raises were neither disclosed to nor approved by the participants of the ESOP and were concealed from appropriate oversight.

d. The Key Man Life Insurance policy on Plaintiff, approved by Cadena in 2019 and funded by the Company, was permitted to lapse in January 2024 due to non-payment. Plaintiff was never notified of the policy's termination. This lapse violated the duty to protect assets and benefits crucial to plan participants and the Company.

e. Replacement of qualified HR and security staff with loyalists to avoid oversight. These personnel decisions were designed to circumvent fiduciary checks and balances, violating the duty of prudence under ERISA § 404.

f. Defendant Cadena, acting as a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached his duties of loyalty and prudence by orchestrating and maintaining the employment of his spouse under false pretenses, including knowingly designating her as an employee with access to USCB's payroll and ERISA-covered benefit plans despite her lack of actual duties or system access. This arrangement diverted corporate and plan assets to an ineligible individual, constituting a misuse of plan assets in violation of ERISA §

404(a)(1)(A)–(B), 29 U.S.C. § 1104(a)(1)(A)–(B), and prohibited transactions under ERISA § 406, 29 U.S.C. § 1106. USCB, as the plan sponsor and fiduciary, further breached its oversight duties by knowingly permitting this scheme and concealing it from participants and regulators. Plaintiff's efforts to raise questions about this misconduct and to cooperate with the U.S. Department of Labor triggered retaliation, including his wrongful termination, in violation of ERISA § 510, 29 U.S.C. § 1140.

79.    As a direct result of these breaches of fiduciary duty, the Plaintiff suffered significant harm, which included the loss of vested benefits, including Phantom Shares and SARS, loss of life insurance coverage under the Key Man policy, loss of career reputation, retirement value, and income linked to the mismanagement of ERISA-covered plans, and emotional distress and reputational harm, resulting from the retaliatory actions taken in response to his inquiries and disclosures.

80.    Pursuant to 29 U.S.C. § 1109, Defendant is liable for all losses to the plan resulting from its breaches of fiduciary duty and must make good to the plan all losses resulting from Defendants' breaches of fiduciary duty, to restore any profits Defendants made through the use of Plan assets, and to otherwise provide such equitable and remedial relief as the Court deems appropriate on behalf of the Plan and its participants.

## **THIRD CAUSE OF ACTION**

### **(Violation of California Labor Code § 1102.5 – Whistleblower Retaliation)**

(Plaintiff against All Defendants)

81.    As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint and incorporates them by reference into this cause of action as though fully set forth herein, except those

allegations which are inconsistent with this cause of action.

82. At all relevant times, Plaintiff was an employee of Defendant USCB within the meaning of California Labor Code § 1102.5, and Defendant Cadena was an officer, director, and managing agent of USCB.

83. California Labor Code § 1102.5 prohibits an employer, or any person acting on its behalf, from retaliating against an employee for disclosing information that the employee reasonably believes evidences a violation of state or federal law or regulation, or for refusing to participate in activities that would result in such violations.

84. During his employment, Plaintiff disclosed and refused to participate in unlawful practices, including but not limited to:

    a. the creation and maintenance of the Ghost Employee on payroll, which constituted fraud, misuse of corporate payroll funds, and violation of state and federal criminal law;

    b. payroll irregularities involving undisclosed executive compensation and bonuses, which violated California wage and labor laws as well as federal fraud statutes;

    c. misuse of corporate resources and insurance funds, including false reporting of executive perks; and

    d. systemic retaliation against employees who reported misconduct, including constructive discharge of executives who raised compliance concerns.

85. Plaintiff further engaged in protected activity under California Labor Code § 1102.5 by cooperating with investigators from the United States Department of Labor and the Federal Bureau of Investigation regarding suspected payroll fraud, corporate mismanagement, and financial misconduct.

86. Defendants knew of Plaintiff's protected activities. Indeed, during

Plaintiff's termination meeting on April 4, 2024, Defendant Cadena questioned why Plaintiff had not immediately notified him about the Federal Law Enforcement Agents' visit to his home, showing clear awareness of Plaintiff's cooperation with federal authorities.

87.     Shortly after Plaintiff's disclosures and cooperation with regulators, Defendants retaliated by abruptly terminating Plaintiff under the false pretense that his position was "eliminated." This adverse employment action occurred less than four months after Plaintiff's confidential meeting with the DOL and mere weeks after the Federal Law Enforcement Agencies' investigative contact.

88.     The stated reason for termination was pretextual. Plaintiff's role was critical to the ongoing "Digital First" compliance initiative, and just one day before his termination, Cadena praised Plaintiff's contributions to resolving major compliance issues.

89.     Defendants' retaliation violated California Labor Code § 1102.5, as Plaintiff's termination was motivated by his protected disclosures and cooperation with regulators.

90.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered substantial damages, including loss of wages, benefits, equity compensation, future earning capacity, severe emotional distress, reputational harm, and loss of career opportunities.

91.     Pursuant to California Labor Code § 1102.5(j), Plaintiff is entitled to recover compensatory damages, punitive damages, and reasonable attorney's fees and costs.

## FOURTH CAUSE OF ACTION

### (Wrongful Termination in Violation of Public Policy)

(Plaintiff against All Defendants)

92.     As a separate and distinct cause of action, Plaintiff complains and

realleges all of the allegations contained in this complaint and incorporates them by reference into this cause of action as though fully set forth herein, except those allegations which are inconsistent with this cause of action.

93.    Plaintiff's employment was terminated in retaliation for engaging in protected activities that are fundamental to public policy, including the right to report violations of law and corporate fraud to law enforcement and regulatory agencies; the right to cooperate with government investigations; the right to refuse participation in unlawful conduct; and the protection of employees from retaliation for disclosing violations of state and federal statutes, including California Labor Code § 1102.5, California Assembly Bill 1020 (AB 1020), federal fraud statutes (18 U.S.C. §§ 1341, 1343), and other laws of general application.

94.    At the time of his termination on April 4, 2024, Plaintiff was actively cooperating with the U.S. Department of Labor's audit into corporate practices and was participating in a federal law enforcement investigation's inquiry into suspected payroll fraud, for which notice had been issued to USCB by July 21, 2023.  Plaintiff was also contacted by federal law enforcement agents, who visited his residence on February 15, 2024, in connection with suspected payroll and benefit fraud committed by high-level employees of USCB. Rather than being supported or protected, when these visits were disclosed, Plaintiff was ruthlessly interrogated about the visits by Cadena during meetings in which Plaintiff's employment was abruptly terminated.

95.    On April 4, 2024, Plaintiff was terminated during an in-person meeting with Cadena and USCB's HR Director. The Plaintiff was advised his executive level position was being "eliminated," despite there being no reduction in need for his services (a Digital First project which the Plaintiff implemens had just entered Phase 2), the Company retained non-critical director-level roles post-termination, and Plaintiff's duties were quickly reassigned rather than eliminated,

consistent with USCB's pattern of concealing terminations as restructuring.

96.    Furthermore, a new organizational chart was issued that same day, without notice, omitting Plaintiff and another executive known to have also cooperated with the federal agencies' inquiries about USCB leadership, indicating premeditated targeting of individuals aligned with internal whistleblower efforts or who cooperated with federal law enforcement inquiries.

97.    Plaintiff's termination was part of a larger campaign to suppress internal dissent and silence those perceived as disloyal or cooperative with federal authorities. USCB further manipulated critical business roles to shield those who demonstrated unquestioned loyalty to USCB's leadership, despite their lack of experience, and other highly qualified employees were demoted without cause.

98.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered damages including lost employment opportunities, a reliable source of income, loss of future compensation, reputational damage, emotional distress, and diminished future employability.

99.    Plaintiff therefore seeks compensatory damages, and punitive damages for USCB's oppressive and malicious conduct, and all other legal and equitable relief deemed proper by the Court.

## FIFTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

(Plaintiff against All Defendants)

100.   As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, except those allegations which are inconsistent with this cause of action.

101.   Defendants engaged in outrageous conduct towards Plaintiff with the intention to cause, or with reckless disregard for the probability of causing,

Plaintiff to suffer severe emotional distress and with wanton and reckless disregard for the injurious result to Plaintiff, as set forth hereinabove. The conduct set forth herein was extreme and outrageous and an abuse of the authority and position of Defendants.

    a. For years, Cadena repeatedly assured Plaintiff that he would succeed him as President of USCB. These promises were made during key events such as Plaintiff's Live Scan background checks and designation as a corporate principal for state licensing purposes. Plaintiff was also informed that he was "essential" to the Company's future, as evidenced by the issuance of a Key Man Life Insurance Policy and the receipt of significant executive benefits, including BeniComp, SARS, and Phantom. Despite this, Plaintiff was abruptly terminated on April 4, 2024, without warning, valid cause, or prior performance concerns, just one day after Cadena praised his work on a major strategic initiative.

    b. On February 15, 2024, the federal law enforcement agents conducted a visit to the Plaintiff's residence in connection with an ongoing investigation into alleged misconduct by USCB executives. Instead of providing the necessary support and protection for his cooperation, once the visit was disclosed to USBC's executives, the Defendants intervened in a retaliatory manner. During his exit meeting, the Plaintiff was questioned regarding his failure to promptly disclose contact with the federal law enforcement agents. This response from Defendants, specifically Cadena and USCB's Human Resources Director, further intensified the Plaintiff's feelings of fear, anxiety, and distress, particularly given his crucial role as a key witness in a federal investigation.

c. Over his 25-year career at USCB, Plaintiff received numerous awards, including Employee of the Year and multiple "Above and Beyond Recognition Awards". Yet, his career was destroyed in a matter of minutes with no forewarning, and his long-earned equity compensation was forfeited. Upon being terminated, the Plaintiff was required to pack his own belongings while being monitored and was asked to leave the premises under the false pretense that his role had been "eliminated," when in fact his responsibilities were reassigned to others.

102. The conduct described above, among many others, was either intended to cause severe emotional distress or was carried out with a conscious disregard for the likelihood of causing such distress. This behavior went beyond the inherent risks of employment and was not the type of conduct typically expected from an employer.

103. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has sustained and continues to sustain pain and suffering, extreme and severe mental anguish, and emotional distress. Plaintiff has incurred and will continue to incur medical expenses for treatment and for incidental medical expenses; and Plaintiff has suffered and continues to suffer a loss of earnings and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

104. Plaintiff is informed and believes and thereon alleges that USCB and its managing agents, managers, officers, and/or directors committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or oppression, and in conscious disregard of Plaintiff's rights.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. ERISA Claims (First and Second Causes of Action)

    a. Equitable Relief: For equitable and remedial relief under ERISA §§ 409 and 502(a)(2), including removal of fiduciaries who have violated their duties, appointment of an independent fiduciary if necessary, and any other relief necessary to protect the interests of Plan participants and beneficiaries;

    b. Restoration of Plan Losses: For an order requiring Defendants to make good to the Plan all losses sustained as a result of Defendants' breaches of fiduciary duty, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a);

    c. Disgorgement of Profits: For an order requiring Defendants to restore to the Plan any profits made through the use or misuse of Plan assets, and to disgorge all amounts improperly diverted to ineligible individuals or "ghost employees."

    d. Declaratory and Injunctive Relief: For a declaration that Defendants breached their fiduciary duties under ERISA and for injunctive relief prohibiting future violations;

    e. Reinstatement to Plaintiff's former position or an equivalent position, or, in the alternative, an award of front pay;

    f. Attorney's Fees and Costs: For an award of Plaintiff's reasonable attorney's fees and costs of suit under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

2. California Labor and Public Policy Claims (Third, Fourth, and Fifth Causes of Action)

    g. For general damages of not less than $7 Million, including lost

wages, lost future income, diminished earning capacity, lost equity compensation, and other consequential losses;

h.  General damages for emotional distress, pain and suffering, humiliation, and reputational harm;

i.  Punitive damages pursuant to California Civil Code § 3294 and California Labor Code § 1102.5(j), for Defendants' oppressive, fraudulent, and malicious conduct;

j.  Reasonable attorney's fees and costs under California Labor Code § 1102.5(j),

3. All claims

k.  Pre- and post-judgment interest as allowed by law;

l.  Costs of suit incurred herein; and

m. Such other and further legal and equitable relief as the Court may deem just and proper.

DATED: September 12, 2025

Respectfully submitted,

ZHONG LUN LAW FIRM LLP

By: _____
Leodis C. Matthews
Angelica Chopuryan
*Attorneys for Plaintiff*